**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PETER G. LAW, | : | |
| **Plaintiff** | : | **No. 1:19-cv-02007** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| HARRISBURG AREA COMMUNITY | : | |
| COLLEGE, | : | |
| **Defendant** | : | |
| | : | |

**<u>MEMORANDUM</u>**

This case arises out of the termination of Plaintiff  Peter G. Law ("Plaintiff" or "Law")'s

employment with Defendant Harrisburg Area Community College ("Defendant" or "HACC") in

October of 2017, which Plaintiff alleges was due to age discrimination in violation of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et seq</u>., and the Pennsylvania

Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 <u>et seq</u>.  (Doc. No. 1.)  Before the Court is

Defendant's motion for summary judgment.  (Doc. No. 28.)  For the reasons that follow, the

Court will grant the motion.

I.     **BACKGROUND**[1]

Plaintiff, who was born on February 16, 1954, is currently a sixty-seven (67) year old

white male who started working for Defendant on January 29, 2012, as the Dean of Student

Affairs at Defendant's Harrisburg campus.  (Doc. No. 29-1 ¶ 2.)  HACC is a community college

(the "College") in central Pennsylvania with over 50,000 students enrolled at the College's five

campuses and online.  (<u>Id.</u> ¶ 1.)   In his position as Dean of Student Affairs, Plaintiff was the

---

[1] The following relevant facts of record are taken from Defendant's Statement of Undisputed
Material Facts ("SUMF") (Doc. No. 29-1), and Plaintiff's Answer to Statement of Undisputed
Material Facts ("ASMF") (Doc. No. 30-1), and are undisputed unless otherwise noted.  Both the
SUMF and the ASMF contain specific citations to the record at each numbered paragraph.

highest-ranking student affairs employee at Defendant's largest campus.  (Id. ¶¶ 3-4.)  Plaintiff reported directly to Defendant's Vice President for Student Affairs as well as Defendant's Harrisburg campus Vice President.  (Id.)  Plaintiff's job duties as Dean of Student Affairs included the following:  "supervision of approximately 65-80 staff members in the areas of recruitment, admissions, financial aid, counseling and advising, career services, placement services, student judicial affairs, student life, athletics and recreation and the day-to-day management of activities in student center areas."  (Id. ¶ 5.)  Plaintiff received his bachelor's degree from Shippensburg University in 1976 and a master's degree from the same university in 1978, but did not complete a Ph.D.  (Id. ¶ 6.)

At the beginning of his employment, Plaintiff received a number of Defendant's policies, including its harassment policy.  (Id. ¶ 7.)  Plaintiff was also trained on Defendant's Equal Employment/Educational Opportunity Policy ("EEO Policy"), which is attached to Defendant's motion as Exhibit E.  (Id. ¶¶ 8-9.)  Throughout Plaintiff's employment, Defendant also maintained a policy prohibiting sexual harassment.  (Id. ¶ 10.)  The parties dispute whether Exhibit F to Defendant's motion is its sexual harassment policy, as Defendant maintains (id. ¶ 11); Plaintiff asserts that Exhibit F is Defendant's harassment handbook, which he asserts is distinct from the harassment policy, which he attaches to his response as Exhibit T (Doc. No. 30-1 ¶ 9).  The Court's review of the referenced exhibits reveals that Defendant's Exhibit F is entitled "Shared Governance Handbook Document," and Plaintiff's Exhibit T is entitled "Shared Governance Policy."  (Doc. Nos. 29-2 at 65-71; 30-2 at 198-201.)  Both documents address the issue of harassment, and both documents define harassment to include "verbal harassment," which is defined as "jokes, epithets, slurs, negative stereotyping, and unwelcome or patronizing remarks about protected characteristics," such as "gender."  (Doc. Nos. 29-2 at 66; 30-2 at 198.)

The parties dispute the contents of the harassment handbook with regard to reporting obligations.  (Compare Doc. No. 29-1 ¶ 12 with Doc. No. 30-1 ¶ 12.)  Defendant maintains that it provides that an "authorized staff person" who receives a harassment complaint must conduct a thorough investigation, and, if the authorized staff person confirms the truth of the accusation or the situation cannot be resolved informally, the authorized staff person must report the matter to the College's Chief Human Resources Officer  (Doc. No. 29-1 ¶ 12), while Plaintiff asserts that "if the authorized staff person confirms the accusation is true AND it cannot be resolved informally, the matter must be reported to the Chief Human Resources Officer"  (Doc. No. 30-1 ¶ 12).  Plaintiff asserts that if the matter "is substantiated and resolved informally, the Chief Human Resources Officer receives the documentation after the matter is resolved."  (Id.)  Della Archer ("Archer"), Defendant's Director of Employee Relations, believes these reporting requirements serve the important College interests of mitigating the corrosive effect on employee morale that inappropriate behavior can cause, and avoiding exposure to potential liability for failing to investigate alleged harassment.  (Doc. Nos. 29-1 ¶ 13; 29-2 at 74.)[2]

Defendant trains its supervisory employees regarding these reporting requirements, and Law received such training through its Employee Training PowerPoint, attached as Exhibit H to Defendant's motion.  (Doc. No. 29-1 ¶¶ 14-15.)  Plaintiff attended the training for sexual harassment and supervisory employees' duties to report potential harassment witnessed by them. (Id. ¶ 16.)  That training states that Title VII of the Civil Rights Act of 1964 makes any supervisor responsible for reporting employment discrimination.   (Id. ¶ 17.)

---

[2]  While Plaintiff does not dispute Archer's beliefs, he maintains that they are immaterial to the case.  (Doc. No. 30-1 ¶ 13.)

Within the first thirty (30) days of Plaintiff's employment with Defendant, the Vice President of Student Affairs issued Plaintiff a written warning for inappropriate conduct and comments toward female students and employees, warning Plaintiff that "one more legitimate incident of inappropriate behavior will result in immediate termination of your relationship with [Defendant]." (Id. ¶ 18.)  On September 23, 2016, Plaintiff received another final written warning for his failure to follow policy requiring him to report harassment and potential violence/stalking of a college employee, Mireya Villalobos-Duran ("Villalobos-Duran"). (Id. ¶ 19.)  Villalobos-Duran was married to Dr. James Duran ("Dr. Duran"), who was a professor of English at Defendant's Harrisburg campus. (Id. ¶ 20.)[3]  Although the parties dispute which of Defendant's departments employed Villalobos-Duran, and therefore where exactly she met Plaintiff, it is undisputed that she began a consensual sexual relationship with Plaintiff which continued for several years. (Id. ¶¶ 21-22; Doc. No. 30-1 ¶¶ 21-22.)[4]

With regard to the details of the relationship between Plaintiff and Villalobos-Duran, Defendant's SUMF includes statements at paragraphs 23 through 28 (Doc. No. 29-1 ¶¶ 23-28), each of which Plaintiff denies because he "is not in possession of the facts to admit or deny this statement." (Doc. No. 30-1 ¶¶ 23-28).  Plaintiff's denials contain no citation to the record. Because a denial based on lack of knowledge is insufficient to create a genuine dispute of fact, the Court will deem the facts set forth at paragraphs 23 through 28 admitted for purposes of the instant motion.  See Estate of D.B. v. Thousand Islands Central Sch. Dist., 327 F. Supp. 3d 477,

---

[3]  While Plaintiff does not dispute this fact, he maintains that it is not material to the case.  (Doc. No. 30-1 ¶ 20.)

[4]  Defendant asserts that Villalobos-Duran worked as a transcript coordinator in the Student Affairs Department at HACC's Harrisburg campus (Doc. No. 29-1 ¶ 21), while Plaintiff maintains that Villalobos-Duran worked at the College Pathways Program (Doc. No. 30-1 ¶ 21). Regardless, Plaintiff maintains that this fact is not material to the case.  (Id.)

485 n. 2 (N.D.N.Y. 2018) (finding that the plaintiff's "denial of the ability to confirm [an] assertion of fact is insufficient to create an issue of fact" and so deeming the fact admitted); Davis v. City of Syracuse, No. 12-0276, 2015 WL 1413362, at *2 (N.D.N.Y. Mar. 27, 2015) (stating that "[o]n a motion for summary judgment, denials of fact that are based on a lack of personal knowledge . . . are insufficient to create a genuine dispute"); Bouriez v. Carnegie-Mellon Univ., No. 02-2104, 2005 WL 2106582, at *3-4 (W.D. Pa. Aug. 26, 2005) (holding that "lack of knowledge denials" without support in the record will be ignored and the court will deem those concise statements of material fact to be undisputed).[5]

In June 2016, another professor at the College, Professor Reid Meredith ("Meredith"), reported to Christine Cappuzzo ("Cappuzzo"), Directing of Counseling for HACC's Harrisburg campus, that his babysitter, Sana—who was recommended by Villalobos-Duran and living with the Durans—told him that Dr. Duran was living with both Villalobos-Duran and Sana as his wives.  (Doc. No. 29-1 ¶ 23.)  Meredith also reported to Cappuzzo that Sana had told him that Dr. Duran had threatened to send Sana back to Pakistan, which concerned Meredith, leading to his report to Cappuzzo.  (Id. ¶¶ 24-25.)  Cappuzzo communicated Meredith's concerns to Archer. (Id. ¶ 26.)  At the same time, Cappuzzo disclosed to Archer that Villalobos-Duran was having an extramarital affair with Plaintiff, who was Cappuzzo's supervisor.  (Id. ¶ 27.)  Cappuzzo also told Archer that she had previously reported concerns about Villalobos-Duran's performance and that, a day later, Plaintiff told Cappuzzo that she "should be more careful" when speaking with

---

[5]  Plaintiff also maintains that these facts are not material to the case.  (Doc. No. 30-1 ¶¶ 23-28.)

HACC's leadership because "news travels fast." (Id. ¶ 28.)  Cappuzo believed Plaintiff's statement was an implicit threat to silence her. (Id. ¶ 29.)[6]

Archer began an investigation into Villalobos-Duran and Dr. Duran with the aid of legal counsel. (Doc. No. 29-1 ¶ 30.)[7]  Dr. Duran and Villalobo-Duran were interviewed separately (id. ¶ 31), and during Dr. Duran's interview, he accused Plaintiff of sexually harassing Villalobos-Duran and arranging a promotion for her within the Student Affairs Department in exchange for sexual favors (id. ¶ 32).  Archer and legal counsel met with Plaintiff about these allegations. (Id. ¶ 33.)[8]

During his first interview on September 1, 2016, Plaintiff admitted that he had been romantically involved with Villalobos-Duran for some time but claimed that the relationship was consensual. (Doc. No. 29-1 ¶ 34.)[9]  Plaintiff also denied Cappuzzo's allegations that he had intervened inappropriately on Villalobos-Duran's behalf. (Id. ¶ 35.)[10]  During the September 1 interview, Plaintiff claimed that Dr. Duran had physically abused and stalked both Villalobos-Duran and Sana (a HACC student). (Id. ¶ 36.)  Plaintiff claimed that he attended a Zumba class in the winter of 2016 that was held on the Harrisburg campus and open to the public, and that Dr. Duran confronted Law in the dance studio during class. (Id. ¶ 37.)  Plaintiff described an event that occurred at the Boro Bar & Grill in Harrisburg sometime around March 2016 while he and

---

[6]  Plaintiff admits only that Cappuzzo believed Plaintiff's statement about how they were under-staffed and everyone was stressed was some sort of "threat," but maintains that this fact is not material to this case. (Doc. No. 30-1 ¶ 29.)
[7]  Plaintiff denies the statements of fact provided in paragraphs 30 through 32 of Defendant's SUMF on the basis of a lack of information to admit or deny the facts. (Doc. No. 30-1 ¶¶ 30-32.)  As discussed supra, because lack of knowledge denials are insufficient to create a dispute of fact, the Court will deem these facts admitted for purposes of the instant motion.  Plaintiff asserts that these facts are not material to the case. (Id.)
[8]  Plaintiff maintains that this fact is not material to the case. (Doc. No. 30-1 ¶ 33.)
[9]  Plaintiff maintains that this fact is not material to the case. (Doc. No. 30-1 ¶ 34.)
[10]  Plaintiff maintains that this fact is not material to the case. (Doc. No. 30-1 ¶ 35.)

Villalobos-Duran were meeting for drinks; specifically, he stated that Dr. Duran entered the bar

area and confronted Plaintiff and Villalobos-Duran.  (Id. ¶¶ 38-39.)  Plaintiff reported that,

during this encounter at the Boro Bar & Grill, Dr. Duran said some things in Spanish, including

"puta," which means "slut" or "whore."  (Id. ¶ 40.)  In connection with his report of this incident

to Archer, Plaintiff stated that Dr. Duran left the bar and returned three times.  (Id. ¶ 41.)  During

his September 1, 2016 interview, Plaintiff described Dr. Duran as a "dangerous person" and a

"manipulative, angry little man."  (Id. ¶ 42.)  Plaintiff further stated that, although he did not fear

that Dr. Duran would attack him, he claimed that he "wouldn't put it past" Dr. Duran to hire

someone to attack him.  (Id. ¶ 43.)  Plaintiff also told Archer and Defendant's legal counsel that

Villalobos-Duran and Sana were prisoners living under Dr. Duran's control.  (Id. ¶ 44.)[11]

As the Dean of Student Affairs, Plaintiff was a member of the Harrisburg campus

Behavioral Intervention Team ("BIT Team"), and as part of HACC's efforts to comply with the

Violence Against Women Act and Title IX, BIT Team members have been designated as

"responsible employees" for fielding complaints about domestic violence and stalking related to

college programs.  (Id. ¶ 45.)  Responsible employees must report complaints about domestic

violence and stalking involving campus employees or students for investigation to the College's

Title IX Coordinator, providing the name of the complaining party, the identity of any potential

witnesses, and details about the event.  (Id. ¶ 46.)[12]  The policy deems all College employees

mandatory reporters when it comes to the College's prohibition against unlawful harassment,

[11]  While Plaintiff admits the facts set forth at paragraphs 37 through 44 of Defendant's SUMF,
he maintains that they are not material to this case.  (Doc. No. 30-1 ¶¶ 37-44.)
[12]  Plaintiff admits this statement but notes that "stalking has a particular meaning under the
Harassment Policy and Handbook."  (Doc. No. 30-1 ¶ 46.)

which includes "domestic violence." (Id. ¶ 47.)[13]  Plaintiff claimed that he told the police that he

was "very fearful" for Villalobos-Duran's safety after the incident at the Boro Bar & Grill. (Id. ¶

48.)[14]  Archer felt that, given Plaintiff's articulated "fear" for Villalobos's safety, he had a

responsibility to report Dr. Duran to HACC's Title IX Coordinator, which he failed to do. (Id. ¶

49.)[15]

Plaintiff also never reported to the Title IX coordinator or any other college authorities

his concerns that Dr. Duran had engaged in stalking and domestic violence, despite the alleged

victims being a HACC employee and a HACC student. (Id. ¶ 50.)  Archer and HACC legal

counsel interviewed Plaintiff again on September 15, 2016, to determine his knowledge of

College policies regarding reporting incidents of domestic violence related to the College. (Id. ¶

51.)  Plaintiff initially stated that he was not required to report such matters if they involved non-

student employees and occurred off-campus. (Id. ¶ 52.)   Plaintiff later admitted that he

participated in extensive training on this topic, including training provided by legal counsel in

February 2016. (Id. ¶ 53.)  Plaintiff stated that he had considered reporting his knowledge of the

alleged abuse and stalking to the College's Human Resources Department, but he had decided

not to do so because he was sexually involved with Villalobos-Duran and feared that disclosure

of that relationship would be professionally embarrassing. (Id. ¶ 54.)[16]  Plaintiff learned that

---

[13]  Plaintiff admits this statement but notes that "domestic violence has a particular meaning under the Harassment Policy and Handbook." (Doc. No. 30-1 ¶ 47.)

[14]  Plaintiff admits this statement but maintains that it is not material to the case. (Doc. No. 30-1 ¶ 48.)

[15]  Plaintiff denies this statement because he is "not aware of Archer's thinking." (Doc. No. 30-1 ¶ 49.)  As discussed supra, because lack of knowledge denials are insufficient to create a dispute of fact, the Court deems this statement admitted.

[16]  Plaintiff admits this statement but states, by way of further response, that he did not report the matter because HACC already knew about the situation, as Aimee Brough, HACC's Vice President of Human Relations, was working with Villalobos-Duran on finding a new living situation. (Doc. No. 30-1 ¶ 54.)

HACC believed he should have reported the matter to the College's Human Resources Department.  (Id. ¶ 55.)[17]

As a result of his failure to report this matter, Plaintiff was issued a final written warning and Corrective Action Form in conjunction with a five-day suspension, attached to Defendant's motion as Exhibit K.  (Id. ¶ 56.)  Defendant concluded that Plaintiff had violated several HACC policies, and created "an actual or apparent conflict of interest" by implicitly threatening Cappuzzo for her criticism of Villalobos-Duran, with whom Plaintiff was romantically involved. (Id. ¶ 57.)  Defendant found that Plaintiff violated Shared Governance 897, the Employee Code of Ethical Conduct, because Plaintiff neglected his reporting responsibilities under HACC's anti-harassment and Title IX policies and violated the Harassment policy by failing to report harassment.  (Id. ¶ 59.)[18]  Plaintiff signed the final written warning and, in his own handwriting, wrote "I abide and commit to the policies of the institution."  (Id. ¶ 60.)

On August 24, 2017, Sara Maines ("Maines"), the Interim Director of Admissions at the time, contacted Archer to report a potential violation of the College's anti-harassment policy. (Id. ¶ 61.)  The parties dispute whether Maines directed Archer to speak with two female employees from the Admissions Office—Danielle Martin ("Martin") and Megan Dickson ("Dickson")—who reported to Maines that inappropriate comments were made by Michael Turi ("Turi"), an admissions counselor at the Harrisburg campus.  (Compare 29-1 ¶ 62 with 30-1 ¶ 62.)[19]

---

[17] Plaintiff admits this statement; however, Plaintiff does not admit that he believes his actions warranted discipline.  (Doc. No. 30-1 ¶ 55.)

[18] While Plaintiff admits that Defendant found a violation of Shared Governance 897, by way of further response, Plaintiff states that he did not report the matter because "he did not believe it was his place."  (Doc. No. 30-1 ¶ 59.)

[19]  Defendant asserts that Maines directed Archer to speak with the two women (Doc. No. 29-1 ¶ 62), while Plaintiff denies that Maines directed Archer to do anything, stating that Maines

As the highest-ranking Student Affairs employee at the Harrisburg campus, Plaintiff provided daily oversight over the Admissions Office in conduction with Maines' position. (Doc. No. 29-1 ¶ 63.) Turi's supervisor at the central level was Maines, and his supervisor at the campus level was Plaintiff. (Id. ¶ 64.) At the time of the August 24, 2017 incident, Dickson was a casual employee who reported to Turi. (Id. ¶ 65.) Martin and Turi were both full-time admissions counselors. (Id. ¶ 66.) Natalie Toma ("Toma"), Interim Dean of Enrollment Management, had overall supervisory responsibility for the Admissions Office. (Id. ¶ 67.) Toma worked in a different building from the Admissions Office staff, while Plaintiff worked in the same building. (Id. ¶ 68.)[20]

In paragraphs 69-71 of Defendant's SUMF, Defendant sets forth a description of statements allegedly made by Dickson and Martin to Maines regarding the incident, which involved a conversation among Martin, Dickson, Turi, and Law in the Admissions Office. Plaintiff raises a hearsay objection to the statements, maintaining that neither Dickson, Martin, or Maines testified by deposition and that no documents have been proffered showing any statements by these individuals. (Doc. No. 30-1 ¶¶ 69-71.) Defendant does not respond to Plaintiff's hearsay objection in its reply brief. The Court notes that, even assuming that the statements constitute hearsay, they can be properly considered on a motion for summary judgment if such evidence is capable of admission at trial. See Fed. R. Civ. P. 56(c)(2). Therefore, the party proffering such evidence "must demonstrate that it could satisfy the

---

reported to Archer that she had heard information from Martin and Dickson, spoke to Natalie Toma to learn next steps, but did not order or direct Archer to conduct an investigation (Doc. No. 30-1 ¶ 62). By way of further response, Plaintiff states that Maines was required to conduct the investigation pursuant to the Harassment handbook. (Id.)
[20] By way of further response, Plaintiff asserts that Maines worked in Gettysburg, on a different campus of HACC. (Doc. No. 30-1 ¶ 68.)

applicable admissibility requirements at trial before the evidence may be used on summary judgment." See Bender v. Norfolk Southern Corp., 994 F. Supp. 2d 593, 599 (M.D. Pa. 2015). Because Defendant makes no effort to demonstrate the potential admissibility of the statements allegedly made by Dickson and Martin to Maines, Defendant fails to meet its burden, and the Court will not consider the statements in connection with the instant motion for summary judgment.

Later on the day of the incident, Dickson emailed Plaintiff to explain that Turi's behavior made her "uncomfortable" and that she was concerned that Turi felt "it was okay to use that kind of language at work." (Id. ¶ 72.) Plaintiff responded by email as follows: "Agree. I was uncomfortable as well." (Id. ¶ 73.) Plaintiff contacted Martin the day after the conversation to check in with her, and she reported to him that she felt uncomfortable with Turi's comments. (Id. ¶ 74.)

The parties dispute whether Law was an "authorized staff person" subject to the Title IX Harassment Policy's reporting requirements. (Compare Doc. No. 29-1 ¶ 75 with Doc. No. 30-1 ¶ 75.)[21] Law did not report the incident to the Title IX Coordinator or Human Resources. (Doc. No. 29-1 ¶ 76.) The parties dispute whether Law reported the incident to his supervisor. (Compare Doc. No. 29-1 ¶ 76 with Doc. No. 30-1 ¶ 76.)[22] It is undisputed that Plaintiff contacted Toma and told her about the incident. (Doc. Nos. 29-1 ¶ 77, 30-1 ¶ 77.) The parties

---

[21] Defendant maintains that Law was an authorized staff person (Doc. No. 29-1 ¶ 75), while Plaintiff points to the deposition of Archer in support of his position that there was no Title IX Harassment policy at the time of his employment (Doc. No. 30-1 ¶ 75). The Court's review of Archer's testimony indicates that she stated that, at the time of the incident in question, "Title IX was incorporated into the sexual harassment policy." (Doc. No. 30-2 at 116.)

[22] Defendant asserts that Law did not report the incident to his supervisor (Doc. No. 29-1 ¶ 76); Law asserts, somewhat confusingly, that he "reported the matter to his supervisor, Steven Ampersand," and "also attempted to report the matter to Ampersand the day after it occurred, but could not reach him as he was out of the office" (Doc. No. 30-1 ¶ 76).

dispute whether Plaintiff took any further action.  (<u>Compare</u> Doc. No. 29-1 ¶ 78 with Doc. No. 30-1 ¶ 78.)[23]  Dickson and Martin reported the incident to Maines, their supervisor, who reported it to Archer.  (Doc. Nos. 29-1 ¶ 79, 30-1 ¶ 79.)

Plaintiff raises a hearsay objection to Defendant's statement regarding the reason that Dickson and Martin reported the incident to Maines—because they "ha[d] heard nothing in response to their complaints to [Plaintiff]."  (<u>Id.</u>)   Again, Plaintiff maintains that neither Dickson, Martin, or Maines testified by deposition in this matter with regard to the reason behind Dickson and Martin's report to Maines.  (<u>Id.</u>)  For the same reasons discussed more fully above—namely, because Defendant has failed to meet its burden to demonstrate the admissibility of the statement—the Court will not consider any statement as to why Dickson and Martin reported the incident to Maines in connection with the instant motion.

Archer testified that she believed that Turi's comments, wherein he used a variation of the word "pussy," triggered the policy's reporting requirements and was concerned that Law had not reported it to the Title IX coordinator after receiving complaints from Martin and Dickson. (Doc. No. 29-1 ¶ 80.)[24]  Specifically, HACC's Summary of Findings regarding the incident indicate that Turi was retelling a story about his part-time employment at a restaurant when he repeated his manager's comment that "I work with a bunch of pussies."  (Doc. No. 30-2 at 100.) Archer began an investigation, which started with interviewing Plaintiff about why he did not report the incident under Defendant's policy.  (Doc. No. 29-1 ¶ 81.)  In connection with that investigation, Plaintiff signed a statement admitting that Turi's comment made him

_____

[23]  Defendant asserts that Plaintiff took no further action (Doc. No. 29-1 ¶ 78); Plaintiff denies this statement and asserts that he called his supervisor and raised the issue in a meeting (Doc. No. 30-1 ¶ 78).
[24]  While Plaintiff admits that Archer testified to these facts, he denies that Turi's comment would trigger reporting requirements under HACC's policies.  (Doc. No. 30-1 ¶ 80.)

uncomfortable and that both Dickson and Martin expressed concerns about Turi's comment. (Id. ¶ 82.) In that statement, which is attached to Defendant's motion as Exhibit P, Plaintiff claimed that he felt that reporting the incident to Toma was sufficient because of his "working relationship [with Toma] on other projects pertaining to recruitment and enrollment." (Id. ¶¶ 83-84.)

The parties dispute Archer's ultimate conclusion regarding the nature of Plaintiff's failure with regard to the incident and the basis for her recommendation to terminate his employment. (Compare Doc. No. 29-1 ¶¶ 85-88 with Doc. No. 30-1 ¶¶ 85-88.)[25] Aimee Brough ("Brough"), Vice President of Human Resources, agreed with Archer's recommendation to terminate Plaintiff's employment. (Doc. No. 29-1 ¶ 89.) Brough forwarded Archer's recommendation to terminate Plaintiff to Dr. John Sygielski ("Dr. Sygielski"), who approved the recommendation after reviewing Archer's investigation facts and findings. (Id. ¶ 90.)[26] Defendant terminated

_____

[25] Defendant asserts that, as a result of her investigation of the incident, Archer determined that Plaintiff "had abdicated his responsibility under the harassment policy." (Doc. No. 29-1 ¶ 85.) Plaintiff denies this statement, pointing to the Summary of Findings of Archer's investigation, wherein she indicates her concern regarding "the failure of an administrator [Plaintiff] to immediately address the use of inappropriate language in the workplace." (Doc. No. 30-1 ¶ 85.) Defendant further asserts that "Archer determined that Law's reporting of the incident to Toma was not sufficient because, as a direct witness of the offensive comments and one of Turi's supervisors, Law could have addressed the situation directly and then reported it to Steven Ampersand, Law's supervisor and the Vice President of Student Affairs." (Doc. No. 29-1 ¶ 86) (citing Doc. No. 29-2, Exhs. B (Archer Declaration), G (UC Transcript)). In response, Plaintiff maintains that "Archer was not concerned with this. Law reported the matter to Turi's supervisor's supervisor. Both Law and Toma reported the matter to Ampersand." (Doc. No. 30-1 ¶ 86.) Defendant further asserts that "[a]dditionally, Archer felt that Law's failure to report the incident could have left Turi's conduct undetected had Martin and Dickson not pursued their complaint." (Doc. No. 29-1 ¶ 87.) Plaintiff denies this statement as well, contending that "Natalie Toma, who decided to take responsibility for the matter after speaking to Law, reported the matter to Steven Ampersand, who then reported it to Human Resources and Dr. Sygielski. Archer knew this and was not concerned with the incident going undetected." (Doc. No. 30-1 ¶ 87.)
[26] By way of further response, Plaintiff states that Dr. Sygielski spoke to Brough on the phone prior to approving the recommendation. (Doc. No. 30-1 ¶ 90.)

13

Plaintiff's employment by letter dated October 13, 2017, which is attached to Defendant's motion as Exhibit R.  (Id. ¶¶ 91-92.)

The parties dispute the factors taken into consideration by Archer in recommending Plaintiff's termination.  (Compare Doc. No. 29-1 ¶ 93 with Doc. No. 30-1 ¶ 93.)[27]  Defendant maintains that Archer recommended Plaintiff's termination because he "had failed to comply with the College's reporting obligations under its Harassment policy," which Plaintiff denies as stated, noting that Plaintiff's "termination letter states that Law was terminated because he failed to address a Title IX violation."  (Doc. Nos. 29-1 ¶ 94; 30-1 ¶ 94.)  Defendant maintains that "Dr. [Sygielski] did not initiate the investigation, did not participate in any investigation into this incident, and did not communicate with the investigator, Ms. Archer, about the incident"; however, Plaintiff asserts that "Dr. Sygielski could not recall whether he spoke to Archer during the investigation.  However, he spoke to Brough, who supervised Archer."  (Doc. Nos. 29-1 ¶ 95; 30-1 ¶ 95.)  The parties dispute whether Dr. Sygielski influenced Archer's investigation or recommendation to terminate Plaintiff's employment.  (Compare Doc. No. 29-1 ¶ 96; 30-1 ¶ 96.)[28]  The parties further dispute whether Law complained about age-related comments allegedly made by Dr. Sygielski.  (Compare Doc. No. 29-1 ¶ 97 with Doc. No. 30-1 ¶ 97.)[29]

---

[27]  Defendant asserts that Archer did not consider Plaintiff's age when making her recommendation to terminate his employment (Doc. No. 29-1 ¶ 93); Plaintiff denies this statement, maintaining that "[w]hile it is possible that Archer did not harbor animus toward older workers, the environment was infected by the animus of others" (Doc. No. 30-1 ¶ 93).

[28]  Defendant maintains that "Dr. [Sygielski] did not influence the investigation or Archer's recommendation to terminate Law," (Doc. No. 29-1 ¶ 96), which Plaintiff denies, asserting that "Archer made no recommendation before speaking to Brough.  Brough spoke to Sygielski and Ampersand on this matter prior to making the recommendation.  Ampersand spoke to Sygielski during the investigation." (Doc. No. 30-1 ¶ 96).

[29]  Defendant asserts that "[a]t no time while he was employed did Law complain that Dr. [Sygielski], or anyone else, had made discriminatory comments based on his age" (Doc. No. 29-1 ¶ 97), which Plaintiff denies, citing his own deposition testimony in support of the assertion that he "complained to Steven Ampersand"  (Doc. No. 30-1 ¶ 97).

Plaintiff claims that, in July 2015, Dr. Sygielski told Dr. Irwin Clark ("Clark") that Plaintiff was old, although Defendant disputes the claim.  (Doc. No. 29-1 ¶ 98.)  Plaintiff was not a witness to any conversation in which Dr. Sygielski discussed his age.  (Id. ¶ 100.)  The alleged conversation between Clark and Dr. Sygielski occurred when Clark first became employed by Defendant as its Vice President for the Harrisburg campus in July of 2015.  (Id. ¶¶ 101-02.)  Clark, who was one of Plaintiff's supervisors, reported directly to Dr. Sygielski.  (Id. ¶¶ 103-04.)  Clark testified that, within days of beginning his employment with Defendant in July 2015, Dr. Sygielski told him he should "look out" for people, mentioned that Plaintiff was old and suggested that if Clark needed to get rid of Plaintiff, it was Clark's campus and he could do that.  (Id. ¶ 105.)  Clark testified that, other than that comment made by Dr. Sygielski within the first few days of Clark's employment, Dr. Sygielski made no other comments about Plaintiff's age.  (Id. ¶ 106.)[30]  Clark left his employment with Defendant in March 2017.  (Id. ¶ 107.)

After his termination, Plaintiff's position was filled on July 23, 2018 by Dr. Gina Lyn Crance, who is approximately thirteen (13) years younger than Plaintiff.  (Id. ¶ 108.)  However, Dr. Crance and Plaintiff are both over forty (40), and Dr. Crance has higher level educational credentials than Plaintiff.  (Id.)

Defendant filed the instant motion for summary judgment on April 1, 2021, with supporting brief, Statement of Undisputed Material Facts, and exhibits.  (Doc. Nos. 28, 29, 29-1, 29-2.)  Plaintiff filed his brief in opposition to Defendant's motion, Answer to Statement of Facts, and exhibits on April 23, 2021.  (Doc. Nos. 30, 30-1, 30-2.)  Defendant filed a brief in

---

[30]  Plaintiff admits that Clark testified that he could not recall Dr. Sylgielski using the word age after the first meeting; however, he notes that Clark also testified that Dr. Sylgielski would regularly ask about Plaintiff.  (Doc. No. 30-1 ¶ 106.)

reply, with additional exhibits, on May 7, 2021.  (Doc. Nos. 31, 31-1.)  Accordingly, the motion

has been fully briefed and is ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is

warranted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute

is material if it might affect the outcome of the suit under the applicable law, and it is genuine

only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a

verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49

(1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient

disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must

"consider all evidence in the light most favorable to the party opposing the motion."  See A.W.

v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364

F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the motion

with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d

Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment is

warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S. at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not defeat a motion for summary judgment with evidence that would not be admissible at trial.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.   DISCUSSION

### A.   Legal Standard Applicable to Age Discrimination Claims[31]

Under the ADEA, an employer is prohibited from discharging or otherwise discriminating against any individual "with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's age."  See 29 U.S.C. § 623(a)(1).  In order to prevail on an ADEA claim, a plaintiff must establish that age was the "but-for" cause of the adverse employment action at issue.  See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644 (3d Cir. 2015) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)).  A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination.  See Duffy v. Magic Paper Grp., Inc., 265 F.3d 163, 167 (3d Cir. 2001).  Where a plaintiff relies on circumstantial evidence, the Court reviews age discrimination claims pursuant to the three-part framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  See Willis, 808 F.3d at 644.

---

[31] The Court will not differentiate between Plaintiff's federal and state law age discrimination claims because the same analysis applies to both.  See Simpson v. Kay Jewelers, 142 F.3d 639, 643-44 n.4 (3d Cir. 1998).

Under the <u>McDonnell Douglas</u> framework, a plaintiff bears the initial burden of establishing a <u>prima</u> <u>facie</u> case of discrimination.  <u>See</u> <u>Keller v. Orix Credit All., Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1997)).  When a plaintiff satisfies the elements of a <u>prima</u> <u>facie</u> case, that creates an "inference of unlawful discrimination."  <u>See</u> <u>Willis</u>, 808 F.3d at 644 (citing <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 357 (3d Cir. 1999)).  The elements of a <u>prima</u> <u>facie</u> case of age discrimination are: (1) the plaintiff is at least forty years old; (2) the plaintiff suffered an adverse employment decision; (3) the plaintiff was qualified for the position in question; and (4) the plaintiff was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive.  <u>See</u> <u>Burton v. Teleflex Inc.</u>, 707 F.3d 417, 426 (3d Cir. 2013).  Where the plaintiff is not directly replaced, the fourth element may be satisfied if the plaintiff can provide facts which "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."  <u>See</u> <u>Pivirotto</u>, 191 F.3d at 352.

"Once the plaintiff has successfully established a <u>prima</u> <u>facie</u> case creating an inference of discrimination, the burden shifts to the employer who must 'articulate a legitimate, non-discriminatory reason for the adverse employment action.'"  <u>See</u> <u>Willis</u>, 808 F.3d at 644 (quoting <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 412 (3d Cir. 1999)).  At this stage, the employer is not required to prove that the articulated legitimate, non-discriminatory reason was the actual reason for the adverse employment action, but need only provide evidence that would allow a factfinder to determine that the decision was made for non-discriminatory reasons.  <u>See</u> <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  If the employer satisfies this prong, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's proffered non-discriminatory reason was pretextual.  <u>See</u> <u>Burton</u>, 707 F.3d at 726-27.  In order to

18

survive summary judgment when an employer has articulated a legitimate, nondiscriminatory reason for its employment action, a plaintiff must adduce some evidence that would allow a factfinder to reasonably either "(1) disbelieve the employer's articulated reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  See Simpson, 142 F.3d at 644 (citing Fuentes, 32 F.3d at 764),

To establish pretext based on disbelief, a plaintiff's evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to allow a factfinder to conclude that the employer's actions could not have been taken for non-discriminatory reasons.  See Fuentes, 32 F.3d at 759.   In the alternative, to establish pretext based on the argument that a discriminatory reason was "more likely than not a motivating or determinative cause," a plaintiff must present evidence "with sufficient probative force" to allow a factfinder to "conclude by a preponderance of the evidence that age was a motivating or determinative factor."  See Simpson, 142 F.3d at 644-45 (citing Keller, 130 F.3d at 1111).  Specifically, a plaintiff must point to evidence demonstrating that (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably.  See Simpson, 142 F.3d at 645 (citing Fuentes, 32 F.3d at 765).  "If this step is satisfied, at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was impermissible discrimination."  Willis, 808 F.3d at 645 (citing Fuentes, 32 F3d at 763 (internal quotation omitted))

## B.     Arguments of the Parties

Defendant assumes for purposes of its summary judgment motion that Plaintiff has met

his burden to establish a prima facie case of discrimination.  (Doc. No. 29 at 24.)  Defendant

maintains that it has met its burden to articulate a legitimate, nondiscriminatory reason for

Plaintiff's discharge, namely that it "terminated Law for failing to comply with the College's

reporting obligations under its Harassment policy.  Law was on a final written warning for

failing to properly report under the College's policy at the time of the incident that led to his

termination."  (Id.)  Accordingly, Defendant maintains that it has satisfied its burden under the

second prong of the McDonnell Douglas analysis.  (Id.)

In opposition to Defendant's motion, Plaintiff concedes, for purposes of the summary

judgment motion, that Defendant has met its burden to present evidence that he was terminated

for a legitimate, nondiscriminatory reason.  (Doc. No. 30 at 17.)  Plaintiff maintains that he has

adduced sufficient evidence of discriminatory animus to create a genuine dispute of material fact

as to whether Defendant's articulated reason is pretextual.  (Id. at 18.)

In support of his position, Plaintiff first maintains that he has adduced sufficient evidence

under the "so-called 'cat's paw' theory" to create a genuine dispute of material fact as to whether

Defendant's articulated reason is pretextual.  (Id.)  Plaintiff maintains that he may proceed on

this theory if he adduces evidence that individuals displaying discriminatory animus participated

or influenced the termination decision.  (Id. at 18-19.)  Along these lines, Plaintiff argues that

"Dr. Sygielski's discriminatory animus infected the process that led to [Plaintiff's] termination,"

pointing to the testimony of Clark in support of his position.  (Id. at 20.)  Specifically, Plaintiff

points to Clark's testimony that, when he spoke to Dr. Sygielski in the summer of 2015 during

his first few weeks at HACC, "Dr. [Sygielski] talked about Peter Law and his age.  Specifically,

he said that [Law] was old.  He said when – when I first started, he said the campus was my campus. I could do whatever I want to do, and I should really look out – look – look out for certain people.  He mentioned Peter.  He said he was old . . . ."  (Id.) (citing Doc. No. 30-2 at 38).

In addition, Plaintiff points to Dr. Sylgielski's testimony to the effect that "he had conversations with both Mr. Ampersand and Brough through the years raising concerns about Law."  (Id.) (citing Doc. No. 30-2 at 158-161).  Plaintiff further argues that "[c]uriously, other witnesses testified they they could not recall Dr. Sygielski ever raising concerns to them about Law," and maintains that such "testimony rings false considering Dr. Sygielski's own testimony."  (Doc. No. 30 at 21.)  Plaintiff elaborates that "[a] reasonable factfinder would find it peculiar that every employee testified that they 'could not recall' Dr. Sygielski raising a concern to them about Law when Dr. Sygielski himself testified that he raised concerns directly to them on multiple occasions," and argues that "[t]he jury could draw an inference that the witnesses were trying to protect Dr. Sygielski because he revealed his animus to these witnesses in the same manner as he did to Dr. Clark, and that such animus impacted Law's termination."  (Id. at 21.)

Plaintiff also maintains that a reasonable factfinder could conclude that "Dr. Sygielski's animus infected the process of terminating Law by considering Archer's decision to formally remove Dr. Sygielski from ruling on Law's grievance challenging his termination."  (Id.)  In this regard, Plaintiff notes that, according to Defendant's grievance policy, a "five-member grievance committee is established to conduct factfinding and decide whether the grievance has merit[]," thereafter making a recommendation to Defendant's "President or a designee for final decision." (Id. at 21-22.)  Plaintiff maintains that "[h]ere, the grievance committee found merit to Law's grievance and asked the decisionmaker to reconsider whether the conversation Law observed

'was a violation of Title IX and/or a violation of the [Defendant's] harassment policy.'"  (Id. at 22.)

Plaintiff argues that "[u]nder normal circumstances, Dr. Sygielski would review the grievance committee's recommendations and make a final decision"; however, here, "for reasons unknown, Archer gave the decision to Dr. Doherty, [Defendant's] Provost."  (Id.)  Plaintiff points to Archer's testimony to the effect that "grievances go to a designee 'if the matter has a conflict with the president.  And it would appear there was a conflict here which is why Dr. Doherty received it.'"  (Id.) (citing Doc. No. 30-2 at 121).  Plaintiff notes that, when pressed further on the issue, "Archer testified 'I don't recall how she ended up as designee,'" and argues that this testimony "could lead a reasonable jury to conclude that Archer and Brough removed Dr. Sygielski from the grievance process due to his known animus toward Law due to his age." (Id. at 23.)

Plaintiff maintains that a determination regarding the weight to be afforded to Dr. Sygielski's comment to Clark regarding Plaintiff's age is for the factfinder, arguing that the Third Circuit "has held that a remark by an organization's leader may be indicative of a corporate culture that is capable of proving discriminatory animus," citing Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 333 (3d Cir. 1995).  Plaintiff notes that, in Brewer, the CEO of the defendant was quoted in a company newsletter as saying that certain employees in their mid-40s were the future of the company.  (Doc. No. 30 at 25.)  Plaintiff maintains that, while the Third Circuit in Brewer held that "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision," (id. at 25) (quoting Brewer, 72 F.3d at 333), it also held that the CEO's "statement may be used as evidence of managerial policy.  The remark

was not an offhand comment made by a low-level supervisor.  Rather, the comment was made by the CEO in a written newsletter," (id.) (quoting Brewer, 72 F.3d at 333-334).

Accordingly, Plaintiff maintains that "Dr. Sygielski's statement is more indicative of discrimination than the CEO's statement in Brewer," because "Dr. Sygielski's ageist statement to Dr. Clark directly related to Law and was made in the context of informing Dr. Clark that he would not stand in the way of efforts to terminate Law's employment."  (Doc. No. 30 at 25-26.) Plaintiff argues that "[a]lthough the remark was made some time prior to Law's eventual termination, a jury could reasonably believe based on the actions and curious testimony of HACC employees that Archer and Brough knew of Dr. Sygielski's animus, were infected by it, and deliberately shielded Dr. Sylgielski from any formal processes involved in terminating Law's employment for fear that his animus would be exposed."  (Id. at 26.)

In addition to his arguments regarding the "cat's paw theory" and the alleged age-based animus of Dr. Sygielski as a basis for a finding of pretext, Plaintiff also argues that a reasonable jury could disbelieve Defendant's articulated legitimate reasons for his termination.  Plaintiff maintains that "[t]he evidence paints a picture of HACC administrators looking for a reason, any reason, to terminate Law."  (Id. at 27.)  Plaintiff maintains that Defendant has articulated inconsistent justifications for Plaintiff's termination, noting that his termination letter states that "the decision to terminate your employment was made in light of a lack of action on your part as an administrator in appropriately addressing a Title IX violation."  (Id. at 27) (citing Doc. No. 30-2 at 141).  Plaintiff challenges Defendant's conclusion that his conduct constituted a Title IX violation, pointing to the Title IX coordinator's review of Archer's investigation findings and statement to the grievance committee wherein he concludes that it was the pattern of Turi's behavior that, taken together, violated HACC's harassment policy.  (Doc. Nos. 30 at 28, 30-2 at

23

186.)  Further, Plaintiff points to the Title IX coordinator's statement to the grievance committee to the effect that Turi's pattern of actions, coupled with his comment, constituted a violation of the harassment policy, not Title IX.  (Doc. No. 30-2 at 188-89.)

Plaintiff argues that "at some point after Law's termination HACC realized that their Title IX pretext would not stand," and maintains that, in HACC's position statement to the PHRC in response to Law's charge of discrimination, HACC stated that "the relevant point isn't whether Turi's comment, standing alone, violated Title IX, but whether Law was in possession of information sufficient for him to conclude that he needed to address Turi's comment as a potential violation of the College's anti-harassment policy."  (Doc. No. 30 at 29) (citing Doc. No. 30-2 at 192).  Plaintiff argues that Defendant "now tries a third justification," quoting Archer's unsworn Declaration to the effect that "Law should have brought Turi's comments to the attention of the Title IX Coordinator in accordance with the policy that says if there's potential Title IX implications, that you are to bring it to the Title IX Coordinator and/or he could have brought it to the Office of Human Resources."  (Doc. No. 30 at 36) (citing Doc. No. 29-2 at 53). Plaintiff notes that the "basis of this allegation is HACC's Harassment Handbook, which states: '[i]n cases with potential or actual Title IX implications, the Title IX Coordinator will be consulted and informed of the outcomes of the investigation.'"  (Id.) (citing Doc. No. 29-2 at 70). Plaintiff maintains that he did not violate this policy, as he correctly determined that Turi's comments did not have Title IX implications, and argues that the weakness of this alleged basis for his termination is demonstrated by the "fact that neither Archer, Sarah Maines, nor Natalie Toma were disciplined for failing to consult the Title IX Coordinator during an investigation into the matter.  If Law violated the Policy for not consulting with the Title IX Coordinator, so did Archer, Maines, and Toma."  (Doc. No. 30 at 31.)

Plaintiff further asserts that Defendant's stated reason for termination—failure to follow reporting procedures—is "so weak and incoherent that a reasonable jury could find it is pretext for discrimination." (Id.) Plaintiff maintains that, because he never received a report of harassment from Dickson or Martin, according to HACC's harassment policy, he was under no obligation to make a report of harassment; further, Plaintiff asserts that—with regard to HACC's position that Law's witness to the offensive comments, as one of Turi's supervisors, imposed on him a duty to address the situation directly—neither the Harassment policy or the handbook required him to personally address the matter with Turi. (Id. at 32.) Rather, Plaintiff maintains that the harassment policy states that a witness to alleged harassment must report it to either his or her supervisor or the supervisor of the alleged harasser. Accordingly, Plaintiff maintains that he: "raised Turi's conduct with Ms. Toma, the administrator with oversight of Turi's department, the day after the incident," "attempted to reach Stephen Ampersand," and "followed-up with Ms. Toma the next day and learned that she reported the matter to Stephen Ampersand." (Id.) Plaintiff argues that his report to Toma as Turi's supervisor's supervisor made sense, as Turi's direct supervisor, Maines, "was new to the role, based at a campus in Gettysburg, and in an interim position." (Id. at 32-33.)

Finally, Plaintiff takes issue with Archer's finding that "[b]ecause the two female employees had complained to Law about this gender-based insult, any reasonable supervisor in Law's position should have concluded that Turi's comment triggered the policy's reporting requirements." (Doc. No. 29-2 at 53.) He maintains that the female employees never stated to him that Turi's statement was insulting because of gender, and further, that assuming the statement was a potential violation of the verbal harassment policy reported to Law by the two women, the Harassment handbook only required a supervisor such as Law to report it if "Law

determined that harassment was substantiated and: (1) "the situation cannot be resolved informally;" (2) the behavior is egregious; or (3) the situation requires a confidential investigation.  (Doc. No. 33 at 36) (citing Doc. No. 29-2 at 45, 69).  Plaintiff insists that HACC does not argue that "the discrimination was substantiated, could not be resolved informally, was egregious, or required a confidential investigation."  (Doc. No. 30 at 34.)

Accordingly, for all of the above reasons, Plaintiff maintains that HACC's Harassment policy and handbook required Plaintiff to "do nothing more than what he did.  We know this because human resources received timely reports on the incident and Ms. Toma received no discipline for her failure to treat the matter as a Title IX or Harassment Policy violation."  (Id.) Therefore, Plaintiff maintains that "[a] reasonable jury could conclude that Archer and Brough were looking for cause to terminate Law because Dr. Sygielski thought he was too old and took the path of least resistance due to Law's previous discipline."  (Id.)

### C.    Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claims

Upon careful consideration of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Plaintiff has failed to produce evidence from which a reasonable factfinder could conclude that Defendant's legitimate, non-discriminatory reason for terminating his employment—namely, Plaintiff's failure to comply with reporting obligations under Defendant's Harassment policy while on a final written warning for a previous failure to comply with reporting obligations—was a pretext for discrimination.  As noted above, for Plaintiff's discrimination claim to survive summary judgment when his former employer articulates a legitimate, nondiscriminatory reason for its action, the burden shifts to Plaintiff to demonstrate pretext by either "(i) discrediting the proffered reasons, either circumstantially or directly, or (ii)

adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  See Fuentes, 32 F.3d at 764.  As noted above, in attempting to meet that burden, Plaintiff first relies on the "cat's paw" theory of liability to argue that he has pointed to evidence from which a reasonable factfinder could conclude that age-related bias "infected" Defendant's decision to terminate Plaintiff, and second, argues that there is evidence from which a reasonable factfinder could disbelieve Defendant's articulated reason for terminating his employment.  The Court addresses each claim in turn.

Courts in this Circuit have recognized the "cat's paw" theory as a basis for establishing discriminatory animus under the ADEA.  See Howells v. Raymond Furn. Co., Inc., 26 F. Supp. 3d 366, 372 (M.D. Pa. 2014) (stating that "[p]laintiffs may also demonstrate discriminatory animus under the ADEA by utilizing the 'cat's paw' theory"); Patel v. Shinseki, 984 F. Supp. 2d 461, 475 (W.D. Pa. 2013) (noting that the "Third Circuit had previously embraced the 'cat's paw' theory in the context of an ADEA claim" in Abramson v. William Paterson Coll. Of N.J., 260 F.3d 265 (3d Cir. 2001)).  Under this theory, "a plaintiff may demonstrate discrimination by offering evidence that 'those exhibiting discriminatory animus influenced or participated in the decision to terminate'" him or her.  See Howells, 26 F. Supp. 3d at 372 (internal citations and quotations omitted).

Plaintiff argues that a single age-based comment that he was "old"—allegedly made by Dr. Sygielski more than two years before his termination—is sufficient evidence from which a reasonable factfinder could conclude that the decisionmaking process to terminate his employment was "infected" with age-related bias.  The statement referenced by Plaintiff allegedly occurred in a conversation between Dr. Sygielski and Clark in July 2015, when Clark

first became employed by HACC as its Vice President of the Harrisburg campus (and Law's

supervisor).  (Doc. No. 29-1 ¶¶ 98-104.)  Clark testified that Dr. Sygielski told him he should

"look out" for certain people, mentioned that Plaintiff was "old" and suggested that if  Clark

needed to get rid of Plaintiff, it was Clark's campus and he could do that.  (Id. ¶ 105.)  Clark

testified that Dr. Sygielski made no other comment about Law's age.  (Id. ¶ 106.)  When Plaintiff

was asked at his deposition if he had "other evidence of age discrimination" besides the

comment of Sygielski testified to by Clark, he replied "I do not have any."  (Doc. No. 31-1 at 3-

4.)

 However, in further support of his theory that Dr. Sygielski's alleged age-related bias

"infected" the decision to terminate his employment, Plaintiff points to Dr. Sygielski's testimony

to the effect that "he had conversations with both Mr. Ampersand and Brough through the years

raising concerns about Law."  (Doc. No. 30 at 20) (citing Doc. No. 30-2 at 158-161).  Plaintiff

argues that because other witnesses could not recall Dr. Sygielski raising concerns to them about

Law, a reasonable juror "could draw an inference that the witnesses were trying to protect Dr.

Sygielski because he revealed his animus to these witnesses in the same manner as he did to Dr.

Clark, and that such animus impacted Law's termination."  (Doc. No. 30 at 21.)

 The Court agrees with Defendant that the more than two-year delay between the alleged

age-based remark and Plaintiff's termination alone undermines any suggestion that age was the

but-for cause of Plaintiff's termination.  This is especially so where Plaintiff has pointed to no

evidence that the individuals who conducted the investigation that ultimately led to Plaintiff's

termination were aware of Dr. Sygielski's alleged age-based comment, made more than two

years earlier.  Clark testified that he did not inform anyone that Dr. Sygielski had referred to Law

as "old." (Doc. No. 29-2 at 124.)  Further, Plaintiff points to no evidence indicating that any

"concerns" about Law raised by Dr. Sylgielski to any other individuals were age-based concerns.[32]  Plaintiff has also failed to point to evidence that Archer or Brough relied on any facts provided by Dr. Sygielski in connection with their investigation that resulted in their recommendation to terminate Plaintiff's employment.[33]

The Court also finds Plaintiff's argument regarding the import of Dr. Sylgielski's lack of involvement in the resolution of Plaintiff's grievance regarding his termination unavailing. Plaintiff maintains that HACC "removed Dr. Sygielski from the grievance process due to his known animus toward Law due to his age," because he maintains that, "[u]nder normal circumstances, Dr. Sygielski would review the grievance committee's recommendations and make a final decision," while here, Dr. Doherty, Defendant's Provost, replaced Dr. Sygielski in the grievance process.  (Doc. No. 30 at 23.)  Defendant has proffered evidence that, in connection with his grievance, Law claimed that Dr. Sygielski wanted him removed from his position because of his age.  (Doc. No. 31-1 at 17-24.)  The Court is unpersuaded that Defendant's decision to remove Dr. Sygielski from a decisionmaking position in connection with a grievance involving allegations against him is evidence of pretext.

The facts of this case are distinguishable from <u>Brewer</u>, relied on by Plaintiff.  In <u>Brewer</u>, the Third Circuit held that "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  <u>See</u> <u>Brewer</u>, 72 F.3d at 333.   Accordingly, in that case, the

---

[32]  Plaintiff's argument that Dr. Sygielski raised age-related concerns regarding Law to others that they failed to testify about because they were "shielding" him is pure speculation.

[33]  While Plaintiff notes that Dr. Sygielski spoke to Brough on the phone prior to approving her recommendation to terminate Plaintiff's employment (Doc. No. 30-1 ¶ 90), he points to no evidence of record reflecting that Brough relied in some manner on information provided by Dr. Sygielski in approving Archer's recommendation to terminate Plaintiff's employment.

Third Circuit found that a CEO's age-bias comment appearing in a company-wide newsletter was a "stray remark" that should not be given significant weight, except that it could provide relevant evidence of managerial policy in combination with other evidence of pretext.  See Brewer, 72 F.3d at 333.  Here, unlike in Brewer, Dr. Sygielski's alleged reference to Law as "old" occurred in a private conversation with Clark, an individual who did not participate in any decision-making process to discipline or terminate Law, and who did not inform anyone else at HACC about the comment.  In addition, here, unlike Brewer, Plaintiff points to no "other evidence" beyond Dr. Sygielski's alleged comment suggesting that his termination was a pretext for age discrimination.  When asked in his deposition if he had "other evidence of age discrimination" other than the comment of Dr. Sygielski, Plaintiff replied "I do not have any." (Doc. No. 31-1 at 3-4.)  Accordingly, unlike the newsletter comment in Brewer, evidence of a single comment by Dr. Sygielski in a private conversation more than two years prior to Law's termination does not amount to evidence of a "managerial policy" of age discrimination but is instead more akin to a "stray remark."

In evaluating whether stray remarks are probative of discrimination, the Third Circuit considers three factors:  "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and context of the statement."  See Parker v. Verizon, Pa, Inc., 309 F. App'x 551, 559 (3d Cir. 2009) (citation omitted).  Courts give particular consideration to the third factor, which considers the purpose and context of the statement.  See id. at 559.  As discussed above, the alleged comment by Dr. Sygielski to Clark occurred more than two years prior to Plaintiff's termination, in the context of Dr. Sygielski orienting Clark to various personnel on HACC's Harrisburg campus.  Plaintiff has pointed to no evidence that the remark

was communicated to anyone involved in the investigation that led to Plaintiff's termination, which occurred after Archer and Brough determined that Plaintiff had failed to comply with his reporting obligations under HACC's harassment policy, while on a final written warning for a failure to comply with reporting obligations less than one year earlier.  Under the circumstances, Dr. Sygielski's alleged comment that Plaintiff was "old" is appropriately considered a "stray remark" unrelated to the investigation and decision to terminate Plaintiff's employment. Accordingly, for all of the reasons discussed above, the Court finds that Plaintiff has failed to point to evidence from which a reasonable factfinder could conclude that Dr. Sygielski's alleged discriminatory animus, expressed through a sole alleged comment that Plaintiff was old—made more than two years before the incident that gave rise to his termination—"infected" the decision to terminate Plaintiff's employment.

Plaintiff also argues that he has pointed to evidence from which a reasonable factfinder could disbelieve Defendant's stated reason for his termination.  To establish pretext based on disbelief, Plaintiff's evidence must indicate "such weaknesses, implausibilities, inconsistences, incoherence, or contradictions in the employer's proffered legitimate reasons" to allow a factfinder to conclude that the action could not have been taken for non-discriminatory reasons. See Fuentes, 32 F.3d at 759.  In this regard, Plaintiff maintains that HACC has articulated "shifting rationales" for his termination, arguing that HACC has stated three different reasons for his termination at various times: (1) Plaintiff's failure to report a Title IX violation in connection with Turi's comments; (2) Plaintiff's failure to report Turi's comments as a potential violation of HACC's Harassment policy; and (3) Plaintiff's failure to bring Turi's comments to the attention of the Title IX coordinator as comments with potential Title IX implications, none of which he maintains is adequate justification for his termination.  (Doc. No. 30 at 29-36.)

31

Plaintiff's argument with regard to "shifting rationales" is unavailing.  As noted by Defendant, "in extreme enough cases, an employer's inconsistencies in its proffered reasons for discharge can constitute pretext."  See Hochstetter v. City of Pittsburgh, 79 F. App'x 537, 539-40 (3d Cir. 2003) (citing Abramson, 260 F.3d at 284)).   Here, the Court is persuaded that Defendant's stated reasons for Plaintiff's termination are not necessarily inconsistent, where Defendant has pointed to evidence of record reflecting the fact that, at the time of the incident in question, Archer, Defendant's Director of Employee Relations, viewed HACC's harassment policy and Title IX policy as one and the same, explaining HACC's use of the terms interchangeably.  (Doc. No. 31-1 at 7.)[34]  In any event, any slight discrepancy with regard to the nature of Plaintiff's stated failure to report under HACC's policies governing harassment does not amount to a case of "extreme" inconsistencies suggestive of pretext.  See Abramson, 260 F.3d at 284 (finding evidence of pretext where employer offered new and unrelated reasons for termination at latter stages of litigation); Smith v. Borough of Wilkinsburg, 147 F.3d 272, 281 (3d Cir. 1998) (finding evidence of pretext where employer gave entirely unrelated rationales for termination to EEOC and trial court).

In addition, Plaintiff claims that a reasonable factfinder could disbelieve Defendant's stated reason for his termination because he did not actually violate HACC's harassment policy.

---

[34] Defendant cites the following exchange at Plaintiff's unemployment compensation hearing:

Referee:     And he – he was either told through the letter or orally that he was being discharged for a Title IX violation?

[Archer]:    Yes, violation of our harassment policy.

***

[Archer]:    Allegedly he failed to report a Title IX violation, which included verbal sexual harassment, to the appropriate parties.

(Doc. No. 31-1 at 7.)

32

In response, Defendant cites Plaintiff's admission at his unemployment compensation hearing that the word used by Turi—"pussies"—was used in a sexist manner, as follows:

EL: Mr. Tori, when he used the term in question, he was using it as slang for a vagina, right?

C: He was using it as slang to describe guys that were not tough.

EL: Well, I mean, was he trying to say that the guys were—did you take it to mean that he was trying to say that the guys were kitty cats or was he trying to say it as—that they weren't tough by referring to a woman's vagina?

C: I took it as I just stated, that they were not tough.

EL: And the term that we're talking about is slang for a female vagina, right?

C: It can be, true.

EL: And you understand that sometimes when it's used to refer to a man that is slang for saying that the man is not tough because he's a woman essentially?

C: Sure.

(Doc. No. 31-1 at 8-9.)  As Defendant further notes, Plaintiff admitted that the comment was inappropriate.  (Doc. No. 30-2 at 67.)

Plaintiff attempts to create a genuine dispute of fact as to the issue of his compliance with HACC's harassment policy by stating as follows with regard to his actions taken following the incident: "[w]hile Law did not report the incident to the Title IX Coordinator or Human Resources because he did not believe the incident amounted to a Title IX violation or harassment as defined under HACC's policy, Law reported the matter to his supervisor, Steven Ampersand. Law also attempted to report the matter to Ampersand the day after it occurred, but could not reach him as he was out of the office."  (Doc. No. 30-1 ¶ 76.)  Plaintiff cites to his own testimony in support of his assertion that he notified his supervisor of the incident.  The Court notes that

Ampersand testified at his deposition that it was he who raised the issue with Plaintiff.  (Doc. No. 30-2 at 91.)

Regardless, even if the Court were to credit Plaintiff's assertions that he notified Stephen Ampersand of the incident (and therefore arguably complied with the harassment policy's requirements), it is clearly established that a plaintiff "cannot simply show that an employer's decision was wrong or mistaken" to establish pretext "since the factual dispute at issue is whether the discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." See Abels v. DISH Network Serv., LLC, 507 F. App'x 179, 185 (3d Cir. 2012) (citing Fuentes, 32 F.3d at 765).  In examining an ADEA claim, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions," but is tasked with determining "whether a factfinder could reasonably find that the employer's stated reason is unworthy of credence."  See Brewer, 72 F.3d at 332.

Viewing the record as a whole, and construing all facts in the light most favorable to Plaintiff, the Court finds no factual basis upon which a reasonable factfinder could either disbelieve Defendant's contention that Plaintiff was terminated for his failure to report a potential violation of its Harassment policy while on a final warning for failure to report a previous violation or believe that a discriminatory reason was more likely than not a motivating or determinative cause of Defendant's decision to terminate Plaintiff's employment. Accordingly, the Court will grant Defendant's motion for summary judgment.

## IV. CONCLUSION

For all of the foregoing reasons, the Court will grant Defendant's motion.  An appropriate Order follows.